IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| MELANIE OGLETREE, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:19-CV-03806-LMM |
| | : | |
| AETNA LIFE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | |

## ORDER

This case comes before the Court on Plaintiff Melanie Ogletree's Motion for Summary Judgment [21] and Defendant Aetna Life Insurance Company's ("Aetna") Motion for Judgment on the Administrative Record [22]. After due consideration, the Court enters the following Order.

## I.   BACKGROUND

Plaintiff brings this suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et. seq., and seeks to recover long-term disability benefits under a group policy issued by Defendant Aetna to her former employer, United Parcel Services of America, Inc. ("UPS"). See Dkt. No. [1]. Plaintiff argues that Defendant's decision to deny her long-term disability benefits was (1) wrong and (2) unreasonable. Dkt. No. [21-1] at 20–24. By contrast, Defendant argues that

its denial was (1) correct and that (2) even if the Court were to disagree, the Court should nevertheless afford deference to Defendant's decision because it was reasonable and not arbitrary or capricious. Dkt. No. [22-10] at 20–23.

The relevant facts in this case, which are discussed in detail below, are based entirely on the administrative record. The primary point of disagreement between the parties is whether Plaintiff's medical documentation for the time period relevant to her long term disability claim—which stems from her absence from work at UPS as of November 15, 2017, due to her psychiatric conditions—supports a finding that she was functionally impaired from performing the material duties of her occupation due to her claimed disability. See generally Dkt. Nos. [21-1, 22-10]. Though Defendant acknowledges that the "evidence in the administrative record showed [Plaintiff] has a psychiatric condition and that her psychiatrist states she has no work capacity," Defendant argues that "the psychiatrist's records did not support that level of restriction during the time period she claimed to be disabled." Dkt. No. [27] at 2.

As a preliminary matter, the Court notes that Plaintiff has moved for summary judgment under Rule 56, and Defendant has moved for judgment on the administrative record under Rule 52. "In the ERISA context, motions under Rule 52 or under Rule 56 are nothing more than vehicles . . . for [a] decision on the administrative record. Thus, regardless of the specific

vehicle chosen, the standard of review—which requires the Court to review the administrative record—remains the same." <u>Graham v. Life Ins. Co. of N. Am.</u>, 222 F. Supp. 3d 1129, 1137 (N.D. Ga. 2016) (citations and internal quotation marks omitted). The Eleventh Circuit has also stated that in cases based on an agreed-upon administrative record, "Rule 56 practice seems to be an extra and unnecessary step—and one that can result in two appeals rather than one." <u>Doyle v. Liberty Assurance Co. of Boston</u>, 542 F.3d 1352, 1363 n.5 (11th Cir. 2008) ("It seems preferable in a case [based on the administrative record] to determine by conference or stipulation whether either party desires to present evidence beyond the administrative record, and, if not, take the case under submission and enter findings of fact and conclusions of law."). In this case, the parties have relied on the administrative record and have not indicated to the Court that they wish to present evidence beyond that record. Accordingly, the Court will enter findings of fact and conclusions of law pursuant to Rule 52. <u>See</u> Fed. R. Civ. P. 52(a)(1).

## II.   FINDINGS OF FACT[1]

### A. The Long-Term Disability Group Policy

---

[1] The findings of fact and conclusions of law in this Order are based on the administrative record that was available to Defendant when it made its decision regarding Plaintiff's long-term disability benefits. <u>See</u> <u>Blankenship v. Metro. Life Ins. Co.</u>, 644 F.3d 1350, 1354 (11th Cir. 2011) (per curiam).

Effective January 1, 2013, Defendant Aetna issued Group Policy No. GP-839230-GI ("the group policy") to UPS to fund long-term disability benefits under UPS's employee welfare plan, which is governed by ERISA. AR 1493.[2] Under the group policy, the "Test of Disability" is as follows:

> From the date that you first became disabled and until monthly benefits are payable for 24 months, you meet the test of disability on any day that:
>
> - You cannot perform the material duties of your own occupation solely because of: an illness; or an injury; or a disabling pregnancy-related condition; and
> - Your earnings are 10% or less of your adjusted predisability earnings.
>
> After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition.

AR 1519. Additionally, the group policy provides Defendant with the "discretionary authority to review all denied claims for benefits under this Policy[,]" and that, "[i]n performing its review, [Defendant] shall have discretionary authority to determine whether and to what extent employees

---

[2] Defendant attached the administrative record to its Motion for Judgment on the Administrative Record as Exhibits 2–9. See Dkt. Nos. [22-2]–[22-9]. Plaintiff incorporated these exhibits by reference. Dkt. No. [21-1] at 1 n.1. Both parties rely on the record's Bates numbers for record citations, and the Court likewise refers to the Bates numbers themselves rather than to each individual docket entry when citing the administrative record. Like the parties, the Court omits the leading zeroes in these labels, so, for example, AR 000001 is cited as AR 1.

and beneficiaries are entitled to benefits; and construe any dispute or doubtful terms of this Policy." AR 1519.

### B. Plaintiff's Employment and Prior Mental Health Treatment

Plaintiff was employed at UPS as of January 7, 2002, and last worked for UPS as a Deployment Specialist on November 14, 2017. AR 675, 684. As a Deployment Specialist, Plaintiff's "essential job functions" included working "9-10 hours per day, 5 day per week"; reporting to work on a regular and timely basis; "[p]erform[ing] office tasks" such as "paperwork, typing, and/or use of a computer, filing, and calculating"; supervising and training employees effectively; "[w]ork[ing] with and manag[ing] other employees' time and activities"; and demonstrating "a sufficient ability to communicate, through sight, hearing, and/or otherwise to perform tasks and maintain proper job safety conditions." AR 1433. Plaintiff was also required to "[d]emonstrate cognitive ability to: follow directions and routines; work independently with appropriate judgment; exhibit spatial awareness; read words and numbers; concentrate, memorize, and recall; analyze and interpret data/reports; identify logical connections and determine sequence of response; processing up to 2-3 steps ahead." AR 1433.

Plaintiff had a demonstrated history of mental health treatment, including while she worked at UPS. She was admitted to the hospital from

August 20, 2014, to August 22, 2014, with a final diagnosis of "[p]sychosis, not otherwise specified/delirium," as well as anemia and back pain. AR 1097–98. Shortly thereafter, she was readmitted to the hospital from September 17, 2014 to September 21, 2014, with final diagnoses of "[p]sychotic disorder, not otherwise specified," "[a]ttention deficit hyperactivity disorder, not otherwise specified," and "[o]ther psychosocial problems." AR 1081–82. Following these episodes, Plaintiff recovered sufficiently to return to full-time work. AR 1125.

### C. Plaintiff's 2017 Absence from Work and Treatment by Dr. Asaf Aleem

Plaintiff's last day of work at UPS was November, 14, 2017. AR 675. During the time relevant to Plaintiff's long-term disability claim, Plaintiff continued to see her treating psychiatrist, Dr. Asaf Aleem. See AR 1127–59. His medical records were part of the files eventually reviewed for Plaintiff's short-term and long-term disability claims. See AR 561, 984–85, 1375, 1026–27.

On November 14, 2017, Plaintiff had an office visit with Dr. Aleem. AR 1127. Dr. Aleem's notes indicated that Plaintiff had been a patient in his practice "for a number of years," had a history of bipolar disorder including "acute episodes of mania with psychotic symptoms," and had two prior episodes of inpatient hospitalization. AR 1128. In the "Initial Presenting Symptoms" portion of that day's record, Dr. Aleem wrote, "[Plaintiff] is not

doing well, has gained a lot of weight, appears to be slowed down . . . drooling is noted. The patient seems to be somewhat overmedicated." AR 1127. "Bipolar II disorder" was listed under the "Diagnoses" section. AR 1129.

The "Mental Status Examination" section of Dr. Aleem's November 14, 2017 note indicated that Plaintiff exhibited a mildly depressed mood and blunted affect but was not experiencing delusions or hallucinations. AR 1128. This section also indicated that Plaintiff's "insight" and "capacity to form good judgement [sic]" were "fair," and that Plaintiff was neither suicidal nor homicidal. AR 1128. The note indicated that Plaintiff would follow-up in six weeks. AR 1128. On the same day, Dr. Aleem wrote on a prescription pad, "[Plaintiff] was seen in my office today, she is unable to work for the next 90 days." AR 643. Plaintiff was thereafter absent from work as of November 15, 2017. AR 559–61.

In a document dated November 19, 2017, and in connection with Plaintiff's short-term disability claim that pre-dated her long-term disability claim, Dr. Aleem submitted to Aetna a Behavior Health Clinician Statement. AR 658–60. On this form, Dr. Aleem indicated his response to various "yes" or "no" questions regarding Plaintiff's condition by either circling or marking the corresponding box and sometimes providing additional notations. AR 658–60. On this form, Dr. Aleem indicated that he supported Plaintiff being out of work. AR 658. He indicated that Plaintiff required

assistance to compose herself and, under "Additional Examination Findings/Notes," wrote, "flat, slow processing." AR 658. Dr. Aleem further indicated that Plaintiff could not "follow a three step command"; was unable to "perform five operations of Serial 7's or 3's"; did not present with "appropriate dress and hygiene"; had socialization problems; could not safely operate an automobile; was not performing routine shopping; that Plaintiff's focus and concentration was "less than 5 min."; that her "psychomotor activity" was impaired; that her medication caused "sedation"; that she was performing "no work activities in any capacity"; that she had experienced both weight gain and sleep disturbances; and that Plaintiff did "nothing" on a daily basis. AR 659.

On December 20, 2017, following Aetna's request for a clinical update regarding Plaintiff's short-term disability claim, Dr. Aleem provided answers to questions about his treatment of Plaintiff. AR 646. He responded "2-3 months" in response to a question regarding how often he saw Plaintiff for office visits, "no" to an inquiry about whether she was also working with a therapist and, if so, whether he was in contact with the therapist, and he also responded "would not help" to Aetna's inquiry as to whether "a referral to a higher level of care" had been considered. AR 646.

Plaintiff had a follow-up visit with Dr. Aleem on January 10, 2018. AR. 1129. In the "Initial Presenting Symptoms" section of his note, Dr. Aleem wrote, "[Plaintiff] is doing well, offers no complaints. She says her

current medication regimen is working well." AR 1129. The "Mental Status Examination" section of Dr. Aleem's note indicated that Plaintiff's behavior was "cooperative" and "calm"; that there was "no thought disorder"; her "mood/affect" was "mildly depressed" and "blunted"; and "capacity to form good judgement [sic]" and "insight" were both "fair." AR 1129. His notes also indicate that she was to follow-up in three months. AR 1130.

Plaintiff's next follow-up visit with Dr. Aleem was on February 19, 2019. AR 1130. In the "Initial Presenting Symptoms" section of his note, Dr. Aleem wrote, "[Plaintiff] is not doing well, more depressed, more anxious, unable to work, cannot think clearly seems to be stuck in severe depression." AR 1130. The "Mental Status Examination" section indicated that Plaintiff exhibited "decreased psychomotor activity"; her "mood/affect" was "depressed; flat"; she was "oriented"; and both her "capacity to form good judgement [sic]" and "insight" were "limited." AR 1130. His notes indicate that Plaintiff was to follow-up in "2 to 3 weeks." AR 1131.

Plaintiff followed up with Dr. Aleem on March 6, 2018. AR 1131. In the "Initial Presenting Symptoms" portion of his note from that day, Dr. Aleem noted, "[Plaintiff] is still struggling with depression, although her mood is improved a bit. She says she will try to go back to work in about 2 weeks." AR 1131. The "Mental Status Examination" section of his note indicated that Plaintiff was not exhibiting a thought disorder; her "mood/affect" was "depressed; blunted"; she was not experiencing

delusions or hallucinations; she had "poor short term memory"; and her "capacity to form good judgement [sic]" and "insight" were both "poor." AR 1131. The note indicates that Plaintiff was to follow-up in "3 to 4 weeks." AR 1132.

Plaintiff's next follow-up was on April 3, 2018. AR 1133. In the "Initial Presenting Symptoms" section of Dr. Aleem's note from that day, he stated, "[Plaintiff] is doing better, still pretty impaired with her depression and bipolar disorder, has not been able to work. She has tried several medications which are partially effective. She is also gaining a lot of weight." AR 1132. In the "Mental Status Examination" section, he noted that Plaintiff was not exhibiting a thought disorder; her "mood/affect" was "depressed; blunted"; she had "poor short term memory"; and her "capacity to form good judgement [sic]" and "insight" were both "poor." AR 1133. The notes indicated that Plaintiff was to follow-up in one month. AR 1133.

On June 27, 2018, Plaintiff had another follow-up visit with Dr. Aleem. AR 1135. In the "Chief Complaint" section of his notes, Dr. Aleem recorded that Plaintiff was "[n]ot doing well. Low mood and low energy. Some paranoia. Poor personal hygiene and agoraphobic tendencies. Cannot focus. Has poor short term memory." AR 1135. However, in the "Mental Status Examination" section, Dr. Aleem's notes indicated that Plaintiff's "appearance" consisted of "no acute distress" and that there was "appropriate grooming & hygiene"; that her behavior was "cooperative,

pleasant, conversational, good eye contact"; that her speech was "fluent, articulate, regular in rate, rhythm and volume"; that she showed "no notable abnormal movements or coordination issues"; that her "thought process" was "organized, logical, linear and goal-directed"; that she had "good insight and judgment"; and that her memory was "grossly intact" and she had an "average fund of knowledge." AR 1136–38. Dr. Aleem also wrote that he "encouraged [Plaintiff] to pursue psychotherapy on a as needed basis with a licensed professional counsel in addition to what I can provide here. I emphasized that medications are only a piece of the puzzle in regard to reaching his/her potential for optimal mental health . . . ." AR 1140. Dr. Aleem also recorded the following: "[Plaintiff] is med compliant. Medications are only partially effective. We will follow up in one month." AR 1140.

On July 25, 2018, Plaintiff had another follow-up with Dr. Aleem. AR 1140. In the "Chief Complaint" section of his notes, Dr. Aleem wrote that Plaintiff was "[s]till struggling with severe depression, slow processing memory loss. Not acutely depressed, but not doing well at all." AR 1141. Under the "HPI from Initial Psychiatric Evaluation" section, Dr. Aleem noted that, over the previous months, Plaintiff "had become more disabled, more depressed, more impaired, unable to function and consequently has been out on disability." AR 1141. Dr. Aleem further noted that "it may be that [Plaintiff] may end up on long-term disability" but that he was "trying

to stabilize" Plaintiff despite her seeming "pretty impaired at the moment."
AR 1141.

As with his notes from June 27, 2018, however, the "Mental Status
Examination" section of Dr. Aleem's July 25, 2018 notes indicated that
Plaintiff's appearance showed "no acute distress" and that she had
"appropriate grooming & hygiene"; her behavior was "cooperative, pleasant,
conversational, good eye contact"; her thought process was "organized,
logical, linear, and goal-oriented"; her memory was "grossly intact"; and
"good judgment and insight." AR 1142–44. Plaintiff was to follow up in four
weeks. AR 1146.

Shortly thereafter, in correspondence dated July 31, 2018, and again
as part of Plaintiff's short-term disability claim, Dr. Aleem's office
submitted additional information to Aetna. AR 583–85. The questions sent
to Dr. Aleem's office were posed by a clinical psychologist, Heather
Warchoki, PhD, who was assigned as an independent peer reviewer of
Plaintiff's short-term disability file. AR 560. In this document, Dr. Aleem's
office indicated that Plaintiff was "unable to think clearly, paranoid, [and]
extremely depressed" and had "very poor hygiene." AR 584. The office
stated that Plaintiff was "non responsive" to medication and that "[Plaintiff]
cannot work in any capacity." AR 584. The office also indicated its belief
that Plaintiff was functionally impaired "from tasks such as answering a
phone, using a computer, filing, [and] interacting with co-workers[]" and

that she was "too functionally disabled to participate" in certain other

treatment programs. AR 584.[3]

Plaintiff had follow-up visits with Dr. Aleem on October 8, 2018,[4] and

November 5, 2018. AR 1147–59. On November 5, in the "Chief Complaint"

section of his notes, Dr. Aleem wrote that Plaintiff was "[n]ot doing well.

She is increasingly depressed, lethargy, low energy, cannot function, cannot

sing, and has severe short-term memory problems. States she is unable to

---

[3] In a letter dated September 26, 2018, the UPS Claims Review Committee ("the Committee") responsible for determining Plaintiff's short-term disability benefits eligibility notified Plaintiff of its determination that she was functionally impaired from November 15, 2017, to April 5, 2018. AR 561–62. However, the Committee explained that from April 6, 2018 onward, there was "insufficient objective clinical examination findings to support a conclusion that [Plaintiff] [was] unable to perform the substantial and material duties of [her] occupation . . . ." AR 561. The Committee explained its determination with reference to its review of Plaintiff's medical records, as well as to Dr. Warchoki's "Physician Review," both of which reached similar conclusions. AR 561–62. In particular, the Committee noted that Dr. Aleem's June 27, 2018, and July 25, 2018 clinical notes indicated, *inter alia*, that Plaintiff was "cooperative, pleasant, and conversational"; that Plaintiff was "oriented times three, memory was grossly intact with an average fund of knowledge"; and that Plaintiff had "good insight and judgment." AR 562. The letter also stated that clinical notes from another doctor whom Plaintiff had seen on June 6, 2018, for "respiratory symptoms and memory loss" also indicated that Plaintiff was "awake, alert, well groomed, and casually dressed, with good eye contact" and "[n]o suicidal or homicidal ideations . . . or abnormal thought processes." AR 560. The Committee concluded, "This would not be indicative of a disabling mental health condition." AR 562.

[4] The notes for Plaintiff's visit with Dr. Aleem on October 8, 2018, are discussed in the next section with reference to the additional documentation Plaintiff submitted as part of her first appeal of Defendant's long-term disability benefits decision.

do anything. Has had poor response to multiple medications. Discussed possible trial of ECT." AR 1153. However, consistent with all of his notes from June 27, 2018, onward, the "Mental Status Examination" section of Dr. Aleem's notes indicated that Plaintiff's appearance showed "no acute distress" and that she had "appropriate grooming & hygiene"; her behavior was "cooperative, pleasant, conversational, good eye contact"; her thought process was "organized, logical, linear, and goal-oriented"; her memory was "grossly intact"; and "good judgment and insight." AR 1154–56. Plaintiff's diagnosis was listed as "Bipolar II, currently mixed or depressed," and she was to follow up in thirty days. AR 1156, 1158.

### D. Plaintiff's Long-Term Disability Claim

Plaintiff reported her long-term disability claim to Defendant on October 4, 2018. AR 684. Plaintiff's eligibility for long-term disability would have become effective on May 16, 2018. AR 937. In a letter dated November 2, 2018, Defendant denied Plaintiff's long-term disability claim, stating, "It is our opinion that you do not meet the definition of Disability under the plan." AR 937. Defendant's letter noted that its review "confirm[ed] [Plaintiff's] diagnosis of bipolar disorder" but stated that "there [was] no medical data provided for review to support a functional impairment due to your psychological condition."[5] AR 938.

---

[5] Plaintiff argues that, "[d]espite having the short-term disability file, [Defendant] limited its initial review to Dr. Aleem's October 4, 2018 note

In response to Defendant's denial, Plaintiff and Dr. Aleem submitted additional records. AR 736, 739, 944. One of the records was from GA Behavioral Health Professionals/ASMI showing the following: a diagnosis of "bipolar disorder, current episode mixed, severe, with psychotic features"; a "problem date" of October 8, 2018; and a "status" as "current." AR 1400. Another record, from ENT of Georgia – St. Joseph's, indicated that Plaintiff was seen for voice hoarseness. AR 1420. The note stated a past medical history of "mental problems" but also indicated that Plaintiff's appearance suggested "no acute distress" and that she was "alert and oriented" and her "mood and affect" indicated "no depression, anxiety or

---

and a July 16, 2018 note from [Plaintiff's] ear, nose and throat doctor concerning her hoarseness." Dkt. No. [21-1] at 8 (citing AR 937). The suggestion appears to be that Defendant unnecessarily limited its review despite having access to Dr. Aleem's notes regarding Plaintiff's treatment since November 14, 2017. Id. Defendant denies this factual contention and cites documents in the record indicating that the Aetna analyst who initially reviewed Plaintiff's long-term disability claim "specifically note[d] that he would review Plaintiff's short-term disability claim in connection with processing her [long-term disability] claim." Dkt. No. [27-1] ¶ 77 (citing AR 687). The record does not unequivocally support either side on this point. Though the analyst's notes suggest that he intended to review Plaintiff's short term disability claim, see AR 687–88, Defendant's letter advising Plaintiff of its decision to deny long-term disability benefits states that the review consisted of only two documents—"Return to work note from Dr. Asaf Afeem [sic] dated 10/04/2018" and "office notes from Dr. Kaelyn Krook dated 07/16/2018"—and also states "[t]here is no medical documentation provided from a treating psychiatrist at this time." AR 937–38. Regardless, the administrative record indicates that the two independent physicians who subsequently reviewed Plaintiff's long-term disability claim as part of Plaintiff's appeal did, in fact, review medical records dating back to the time of Plaintiff's short-term disability claim, as well as Dr. Warchoki's "Physician's Review." See AR 984–85, 1375.

agitation." AR 1421. The note suggested that Plaintiff suffered from "chronic reflux laryngitis benign-appearing lesion of larynx." AR 1421.

Finally, Plaintiff also submitted notes from her follow-up visit with Dr. Aleem on October 8, 2018. AR 1147. In the "Chief Complaint" section of his notes from the visit, he recorded that Plaintiff was "[s]till not doing well. Disorganized. Up and down moods. Poor concentration. Poor short-term memory. She has applied for long-term disability with her job, which seems reasonable at this time because we are having a hard time stabilizing her." AR 1147.

As with his notes from June 27, 2018, through November 5, 2018, the "Mental Status Examination" section of Dr. Aleem's notes in October indicated that Plaintiff's appearance showed "no acute distress" and that she had "appropriate grooming & hygiene"; her behavior was "cooperative, pleasant, conversational, good eye contact"; her thought process was "organized, logical, linear, and goal-oriented"; her memory was "grossly intact"; and "good judgment and insight." AR 1148–50. Unlike other notes that had indicated Plaintiff's diagnosis was "Bipolar II," this note stated, "Bipolar disorder, mixed severe with overall poor response to treatment." AR 1150. This note also indicated that Plaintiff was to follow up in one month. AR 1152.

In a letter dated November 13, 2018, Defendant notified Plaintiff that, despite its review of the additional records, Defendant nevertheless had

determined that there remained "insufficient clinical findings to
substantiate a functional impairment from your own sedentary occupation
due to your psychological condition." AR 944. The letter noted that Dr.
Aleem's notes from October 8, 2018, "[d]id not list any emotional, cognitive
or behavioral impairment on the mental status exam." AR 944. At this time,
Defendant notified Plaintiff that she could file a formal appeal of its long-
term disability decision. AR 944.

### E. Plaintiff's First Appeal of Defendant's Long-Term Disability Decision

On November 14, 2018, Dr. Aleem submitted a letter appealing—and
expressing his disagreement with—Defendant's decision regarding
Plaintiff's long-term disability claim. AR 1223. Dr. Aleem wrote,

> [Plaintiff] is to the point where she's unable to get out of bed
> on a daily basis, she's unable to care for herself and is
> becoming more disabling [sic]. In my opinion, [Plaintiff] is not
> mentally stable to work and/or handle any major
> responsibilities as far as her work environment is concerned.
> Therefore, I highly disagree with the final decision that has
> been made for [Plaintiff's] long-term disability.

AR 1223.

Defendant notified Plaintiff in a letter dated November 26, 2018, that
the appeal process had begun. AR 946. Plaintiff herself also submitted an
appeal letter to Defendant on December 14, 2018, stating that she was
disabled and was suffering from various mental health issues, including

Bipolar II, severe anxiety, severe depression, severe obsessive compulsive disorder, and Attention Deficit Disorder. AR 1369–70.

As part of Plaintiff's appeal, Plaintiff's records were peer-reviewed by Dr. John Burruss, a physician board-certified in psychiatry. AR 1374–78. Dr. Burruss was referred by a third-party vendor, PDA, and he reviewed Plaintiff's file, which included medical records from November 2017 to November 2018. AR 1374–75.

In his report, Dr. Burruss expressed his opinion that the records demonstrated various inconsistencies regarding Plaintiff's condition, including the following: (1) Plaintiff's past medical history suggested a diagnosis of "Bipolar I Disorder, the more severe variant," though her records at times appeared to alternate between a Bipolar I and II diagnosis, a situation he deemed "not possible according to the DSM-5"; (2) the "[m]ental status examinations are consistently unremarkable and there is no effort to create objective determinations of symptomatology through rating scales or other instruments" despite evidence of Plaintiff's "reports of subjective depression . . . with some references to failure to maintain daily activities"; (3) the progress notes from Plaintiff's "non-psychiatric clinicians . . . specifically detail the lack of acute psychiatric complaints or symptoms." AR 1376. With regard to whether there was "evidence that the condition(s) resulted in restriction and or limitations for the claimant" during the time relevant to Plaintiff's claim, Dr. Burruss concluded,

> The conditions alleged in the record could create substantial impairment, but the actual subjective reports and examination findings do not reflect such a level of impairment. One would expect significant subjective distress to be accompanied by abnormal mental status examinations . . . . One would expect that the claimant's treatment program would be intensified in the face of progressively worsening symptoms and impairment. This has not happened in this case, with recommended follow-up occurring at interval [sic] of 1-3 months and no adjunctive treatment added.

AR 1377.

In a December 17, 2018 letter, Defendant sent a copy of Dr. Burruss's report to Dr. Aleem, requesting that he respond within ten days regarding his agreement or disagreement. AR 949. On January 6, 2019, Plaintiff communicated with Defendant in response to Dr. Burruss's report. AR 770–75. She explained that Dr. Aleem had been treating her for nearly fifteen years and that, since November, 15, 2017, she had been significantly limited in her level of functionality and was unable to do many everyday activities. AR 771–74. She stated that she could not afford hospitalization and could not afford a therapist without insurance, and she also noted that she did not understand why her records indicated a change of her Bipolar Disorder diagnosis. AR 775.

In a letter dated January 10, 2019, Defendant notified Plaintiff that that its original decision regarding Plaintiff's long-term disability claim remained unchanged. AR 959–60. Defendant noted that Dr. Aleem had not responded to Dr. Burruss's report. AR 959. Defendant stated that it had

reviewed "all of the information previously submitted, as well as new documentation[,] and reevaluated your claim in totality." AR 959. Defendant stated that Plaintiff's record had been reviewed by Dr. Burruss and explained his opinion and conclusions in detail. AR 959. In line with Dr. Burruss's opinion, Defendant concluded that there was a "lack of medical evidence from a physical and mental health perspective supporting a functional impairment preventing [Plaintiff] from performing the material duties of [her] own occupation." AR 960. Defendant notified Plaintiff of her right to a second appeal. AR 960.

### F. Plaintiff's Second Appeal and Defendant's Final Long-Term Disability Decision

Plaintiff submitted an appeal request on January 19, 2019. AR 1364. In support of Plaintiff's appeal, Dr. Aleem wrote a letter to Defendant dated February 5, 2019, in which he stated that Plaintiff's "diagnosis is consistent with Bipolar Disorder mixed, severe w/ psychotic symptoms" and that fluctuations in her symptoms "are natural courses of her bipolar illness." AR 1221. He noted that he "[c]onsider[ed] Plaintiff disabled for regular employment." AR 1221. Dr. Aleem also stated, "Some treatment notes may not be detailed enough as required by disability evaluation. I do not evaluate for disability but I can render my opinion and judgment based on mental illness. If information isn't adequate for disability, I recommend an independent disability evaluation done by a psychiatrist . . . ." AR 1221.

On February 22, 2019, Plaintiff also notified Defendant that she had been awarded Social Security disability benefits. AR 809. On February 13, 2019, Patrice Solomon, PhD, of the Social Security Administration had determined that Plaintiff met listing 12.04AB and was therefore disabled as of November 15, 2017. AR 1166–68. Dr. Solomon noted Plaintiff's history of mental health issues and stated that Plaintiff likely had Bipolar I and that Plaintiff's treating physician "opines she is worsening" and thought it was reasonable for her to seek long-term disability benefits. See AR 1167.

In a report dated February 26, 2019, and as part of the final review process for Plaintiff's long-term disability claim, Plaintiff's file was reviewed by Dr. Edward Chai, a physician board-certified in psychiatry and neurology. AR 984–91. Dr. Chai was referred by a third-party vendor, Reliable Review Services, and reviewed the medical records in Plaintiff's file, including records dating back to Plaintiff's hospitalization in 2014, and also spoke with Dr. Aleem. AR 984–85, 990. Dr. Chai concluded that there was sufficient evidence of a psychiatric condition and that "[t]here was a description of symptoms consistent with depression or bipolar illness." AR 990. However, Dr. Chai concluded that "functional impairment with restrictions/limitations was not supported" for the relevant period in review because "[t]here were no measurable data and/or examination findings to support the claimant's complaints and severity of her mental health conditions for the period in review." AR 990. Dr. Chai noted that Plaintiff

had "reported cognitive issues, but there was no formal cognitive testing performed. It was noted by providers that [Plaintiff] was not doing well, but subsequent examination of [Plaintiff] on the same dates noted [Plaintiff] was pleasant and cooperative." AR 990. Though Plaintiff submitted additional medical information that was subsequently reviewed by Dr. Chai, his opinion remained unchanged. AR 1011–15.

In a letter dated April 16, 2019, Defendant notified Plaintiff of its decision to uphold its original determination regarding her long-term disability claim. AR 1026. Defendant's letter summarized the medical records it had reviewed. AR 1026–27. The letter explained that Defendant had received "correspondence . . . in the form of letters, multiple e-mails, a copy of your claim file from the Social Security Administration and progress notes from your treating providers." AR 1027. Defendant stated that, though Plaintiff "carr[ied] medical conditions for which on-going treatment may be beneficial, these do not rise to a level of severity as to prevent you from performing the material duties of your own occupation . . . ." AR 1027. The letter noted Dr. Chai's conclusion that Plaintiff's medical records did not support a level of functional impairment that would preclude Plaintiff from performing her work duties and concluded, "Based on our review of the medical information in your claim file, we determined there is a lack of medical evidence from a physical and mental health perspective supporting

a functional impairment preventing you from performing the material

duties of you own occupation." AR 1027.

Defendant's letter also acknowledged that Plaintiff had been

approved for Social Security Disability Income and noted that Defendant

had reviewed Plaintiff's Social Security claim file as part of Plaintiff's

appeal. AR 1027. Defendant distinguished its decision from the Social

Security Administration's determination:

> [Social Security Administration] regulations require that certain disease/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to [Social Security Disability Income] benefits. Our review finds that the medical information provided which consisted of medical records from Dr. Aleem and various providers did not support a functional impairment preventing you from performing the material duties of your own occupation as a Deployment Specialist. Therefore, even though you are receiving SSDI benefits, our review confirms you do not meet the test of disability under your employer's [long-term disability] policy and we find you are not eligible for [long-term disability] benefits . . . .

AR 1027. Following Defendant's final decision regarding her long-

term disability benefits, Plaintiff filed this lawsuit.

## III.   LEGAL STANDARD

"ERISA itself provides no standard for courts reviewing the benefits

decisions of plan administrators or fiduciaries." Blankenship, 644 F.3d at

1354 (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109

(1989)). However, the Eleventh Circuit has "established a multi-step

framework to guide courts in reviewing an ERISA plan administrator's

benefits decisions[:]"

> (1)  Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2)  If the administrator decision in fact is "de novo wrong," then determine whether he [or she] was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3)  If the administrator's decision is "de novo wrong" and he [or she] was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his [or her] decision under the more deferential arbitrary and capricious standard).
>
> (4)  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he [or she] operated under a conflict of interest.
>
> (5)  If there is no conflict, then end the inquiry and affirm the decision.
>
> (6)  If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Id.

"Review of the plan administrator's denial of benefits is limited to

consideration of the material available to the administrator at the time it

made its decision." Id. at 1354 (citing Jett v. Blue Cross & Blue Shield of

Ala., 890 F.2d 1137, 1140 (11th Cir. 1989)). "Accordingly, the Court conducts its review of the administrative record, taking into account the arguments presented by the parties in their briefs." Bauman v. Publix Super Markets, Inc. Emp. Stock Ownership Plan, No. 3:15-cv-75-WSD, 2017 WL 5236148, at *5 (N.D. Ga. Mar. 17, 2017) (citation omitted).

## IV.   CONCLUSIONS OF LAW

### A. Whether Defendant's denial was "de novo wrong"

Under the first step of the Eleventh Circuit's framework, the Court reviews the record that was before the plan administrator and determines whether the administrator's decision to deny Plaintiff's claim was wrong. Blankenship, 644 F.3d at 1355. At this step, the Court "stands in the shoes of [Defendant] and starts from scratch, examining all the evidence before [Defendant] as if the issue had not been decided previously." Smith v. Cox Enters., Inc., 81 F. Supp. 3d 1366, 1378 (N.D. Ga. 2015) (quotation marks omitted, alterations adopted, and citations omitted). However, Plaintiff "bears the burden of proving that she is disabled and that [Defendant's] decision is wrong." Herring v. Aetna Life Ins. Co., 517 F. App'x 897, 899 (11th Cir. 2013) (citing Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1247 (11th Cir. 2008)). "If the Court finds, by a preponderance of the evidence, that [Plaintiff] is entitled to benefits, then the decision was de novo wrong." Smith, 81 F. Supp. 3d at 1378.

After reviewing the record, the Court finds that there was sufficient evidence to support a conclusion that Plaintiff was functionally disabled during the period relevant to her long-term disability claim. Indeed, as Defendant acknowledges, Plaintiff was found to be functionally disabled and received short-term disability benefits for at least part of the period that was included within her long-term disability claim. See AR 558–62. Additionally, during some of the office visits in which Dr. Aleem's notes indicated "normal" mental status examinations, Dr. Aleem's notes often still reported troubling observations and even suggested he was considering more advanced treatments such as electroconvulsive therapy. See, e.g., AR 1153–59. This, taken in conjunction with the fact that Dr. Aleem continued to express his support for Plaintiff's disability claim and submitted letters of appeal that noted his belief that she had, in fact, become functionally disabled, weigh in favor of a finding that Plaintiff was functionally disabled. See, e.g., AR 1221, 1223.

Though Defendant concluded that Dr. Aleem's mental status examination notes from June 2018 to November 2018 did not support a finding of functional disability, and though Defendant may not have been required to draw inferences in Plaintiff's favor in the face of discrepancies regarding Dr. Aleem's mental status examination notes, the Court nevertheless finds that there was sufficient evidence elsewhere in the record to support a finding that Plaintiff was functionally disabled,

26

notwithstanding those mental status examination notes. Therefore, the Court finds after a de novo review of the record that it is at least arguable that Defendant's decision was wrong. Because Defendant was vested with discretion in making benefits determinations under the policy, the Court must proceed and consider whether, assuming the decision was wrong, it was nevertheless reasonable. Blankenship, 644 F.3d at 1355.

### B. Whether Defendant's denial was reasonable or arbitrary and capricious

Under this portion of the Eleventh Circuit's framework, Plaintiff "must demonstrate that [Defendant's] decision to deny her [long-term disability] benefits was arbitrary and capricious; that is she must show that [] no reasonable grounds support [Defendant's] decision. Herring, 517 F. App'x at 899 (citing Glazer, 524 F.3d at 1246). "As long as a reasonable basis appears for [Defendant's] decision, it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision." White v. Coca-Cola Co., 542 F.3d 848, 856 (11th Cir. 2008) (quoting Jett, 890 F.2d at 1140).

Plaintiff argues that Defendant's decision to deny Plaintiff long-term disability benefits was unreasonable for at least two primary reasons: (1) Dr. Burruss's and Dr. Chai's reviews were "intrinsically flawed" and thus it was unreasonable for Defendant to rely on them in reaching its decision to deny Plaintiff's long-term disability benefits; and (2) despite Defendant's ability

to have Plaintiff independently evaluated by a physician to potentially

resolve any ambiguities raised by Plaintiff's medical records, Defendant

relied instead upon "file" reviews by two independent physicians. Dkt. No.

[21-1] at 21–24.

To begin, Plaintiff argues that Defendant's reliance on the opinions of

its two independent physician reviewers was unreasonable. Id. at 21–22.

Plaintiff primarily takes issue with some of the conclusions and opinions

expressed by Dr. Burruss and Dr. Chai. Dkt. Id. For example, Plaintiff

argues that Dr. Burruss's review is flawed because he states "that

[Plaintiff's] illnesses are all highly treatable without any acknowledgment

that Dr. Aleem had been trying to treat her conditions for years and the

treatment was not succeeding." Id. at 22 (citing AR 954). Likewise, Plaintiff

argues that Dr. Chai's "report is similarly problematic[]" because, for

example, "Dr. Chai stated that there were no side of effects of medication

noted" yet "[s]ide effects are noted throughout the file including obvious

signs such as drooling." Id. (citing AR 1214). However, Plaintiff does not cite

authority suggesting that it is proper for the Court itself to weigh the

relative strengths or weaknesses of different physicians' professional

opinions.[6]

---

[6] Plaintiff also suggests that Dr. Chai's conclusions were based on his
observation that there was "no evidence of an inability to perform activities
of daily living (ADL'S) or an inability to maintain hygiene." See Dkt. No.
[21-1] at 22 (quoting AR 1214). Plaintiff argues that "[l]egally . . . the ability

The relevant inquiry, therefore, is whether it was reasonable for Defendant to rely on Dr. Burruss's and Dr. Chai's opinions in drawing the conclusion that Plaintiff's medical records did not support a finding of functional impairment during the time relevant to Plaintiff's long-term disability claim. The Supreme Court has explained that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," but also that courts may not "impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

Here, as Defendant argues, Defendant relied on Dr. Aleem's own medical records—his mental status examination notes from June to November 2018—in reaching the conclusion that there was an insufficient showing that Plaintiff was functionally disabled such that she could not perform the material duties of her job. Dkt. No. [22-10] at 21–22. In reaching this conclusion, Defendant relied on the opinions of two physicians board certified in psychiatry who reviewed Dr. Aleem's records

---

to perform activities of daily living does not translate into the ability to perform work." Id. However, this was not the sole basis for Dr. Chai's opinion, nor for Defendant's ultimate denial of benefits, as Dr. Chai noted other issues, such as a lack of "formal cognitive testing" and inconsistent examination findings on days that Dr. Aleem had stated Plaintiff was not doing well. AR 990.

and determined that, at least partly due to these conflicting mental status examinations, there was insufficient evidence of continued functional disability. AR 990, 1376–77. The Eleventh Circuit has stated that "[e]ven where [the claimant's] own doctors offered different medical opinions than [the administrator's] independent doctors, the plan administrator may give different weight to those opinions without acting arbitrarily and capriciously."[7] Blankenship, 644 F. 3d at 1356 (citations omitted).

Plaintiff also argues that it was generally unreasonable for Defendant to base its decision on the apparent inconsistencies in Dr. Aleem's mental status examination notes beginning on June 27, 2018. Dkt. No. [26-1] at 19–22. Though Plaintiff appears to concede that Dr. Aleem's notes "reflect 'normal' mental status examinations" from the time period of June 27, 2018, to November 5, 2018, Plaintiff argues that these discrepancies can be easily explained: (1) "On June 27, 2018, the format of Dr. Aleem's notes changed," and "Dr. Aleem simply forgot to fill out the mental status examination portions or he forgot to save his changes[]"; and thus (2) "[t]his may have been 'default language.'" Id. at 19. Plaintiff argues that it was unreasonable for Defendant to reach its decision based on these particular notes because "[t]he inconsistences are minor and do not reflect

---

[7] In the same decision, the Eleventh Circuit also reiterated that "[p]lan administrators need not accord extra respect to the opinions of a claimant's treating physicians." Id. (citing Nord, 538 U.S. 822, 834 (2003)).

the overall thrust of Dr. Aleem's evidence." Id. at 21; see also Dkt. No. [29] at 3. Plaintiff suggests that Defendant has therefore based its decision "on the evidentiary equivalent of a typographical error." Dkt. No. [26-1] at 22.

As an initial matter, it appears that Dr. Aleem himself acknowledged that his records may not have supported a finding that Plaintiff was functionally disabled under the terms of the group policy: "Some treatment notes may not be detailed enough as required by disability evaluation." AR 1221. More importantly, however, the Court's "[r]eview of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." Blankenship at 1354. Therefore, as Defendant argues, the Court cannot simply adopt Plaintiff's supposition that the notes from Dr. Aleem's mental status examinations from June 27, 2018, to November 5, 2018, "may have been 'default language'" and did not, in fact, reflect Dr. Aleem's clinical observations from those visits. See Dkt. Nos. [26-1] at 19, 22; [30] at 5. Moreover, it is difficult to square Plaintiff's suggestion that Defendant unreasonably focused on the "evidentiary equivalent of a typographical error" rather than viewing the "whole picture" of Plaintiff's files with the fact that—following the route of Plaintiff's argument—Dr. Aleem appears to have "forgotten" to change the "default language" of his mental status examinations over a period of almost five months, which included at least

four visits with Plaintiff, despite his earlier records reflecting that he often updated this section of his notes.

Again, the Court must only consider whether there was a reasonable basis for Defendant's long-term disability decision. In this case, the Court does not find that Defendant entirely lacked a reasonable basis for relying on Dr. Aleem's own records and the opinions of two physicians board-certified in psychiatry to conclude that the change in Dr. Aleem's notes from June through November 2018 may have indicated that Plaintiff was no longer functionally disabled, given that: (1) as Plaintiff herself argues, Dr. Aleem's mental status examination notes prior to June 27, 2018, often reflected findings that appeared more consistent with other observations in his clinical notes from the same days, suggesting he usually updated that section of his notes; (2) Dr. Aleem's mental status examinations changed as of June 27, 2018, onward; and (3) the physicians reviewing Plaintiff's file on appeal noted that some of her medical records contained inconsistencies and concluded, in light of this, that Plaintiff's records did not support a finding of functional impairment during the relevant period.[8] See Blankenship, 644 F.3d at 1356.

_____

[8] Plaintiff also takes issue with Defendant's denial of long-term disability benefits in light of the Social Security Administration's determination that Plaintiff met listing 12.04AB and was therefore entitled to Social Security Disability Income. Dkt. No. [29] at 7–8. In her brief supporting her Motion for Summary Judgment, Plaintiff first argues that the Social Security Administration's decision showed that Defendant's denial was de novo

Plaintiff also argues that "[w]hat truly makes Aetna's decision unreasonable is its failure to send [Plaintiff] to an independent evaluation." Dkt. No. [21-1] at 24. To this end, Plaintiff argues that "[a]n insurer's utilization of only reviewing doctors in ERISA cases involving . . . mental illnesses is often found to be arbitrary and capricious because these diseases . . . are best measured through actual examination." Id. (citing Kinser v. The Plan Admin. Comm. of Citigroup Inc., 488 F. Supp. 2d 1369, 1383 (M.D. Ga. 2007)). Though the Court can appreciate the practical significance of Plaintiff's arguments regarding the difficulty of "objectively" evaluating mental illnesses and a preference toward in-person examination, the Eleventh Circuit has nevertheless stated—in a case that post-dates Kinser—

---

wrong. Dkt. No. [21-1] at 20. Then, Plaintiff's Reply suggests she is also arguing that "[Defendant] acted unreasonably in ignoring Social Security's finding that [Plaintiff] was disabled." Dkt. No. [29] at 7–8. Because the Court has already determined that Defendant's denial was arguably wrong under the first step of the Blankenship framework, the Court need now only consider whether Defendant's decision was unreasonable. Both parties agree that the "the approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan." Oliver v. Aetna Life Ins. Co., 613 F. App'x 892, 897 (11th Cir. 2015) (citation omitted). Thus, even accepting Plaintiff's argument that the Social Security Administration's determination that Plaintiff met listing 12.04AB indicated that Plaintiff was indeed experiencing some level of functional disability, the Court has already discussed why Defendant's determination to the contrary did not entirely lack a reasonable basis. Again, at this stage of the framework, "[a]s long as a reasonable basis appears for [Defendant's] decision, it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision." White, 542 F.3d at 856 (quoting Jett, 890 F.2d at 1140).

that an administrator's decision to rely on file reviews by independent physicians instead of physical examinations is not per se unreasonable. See Blankenship, 644 F.3d at 1357 (citation omitted) ("[W]e do not conclude, as the district court did, that [the administrator's] use of 'file' reviews by its independent doctors—instead of live, physical examinations of [the claimant]—counted as evidence that [the administrator] acted arbitrarily and capriciously, particularly in the absence of other troubling evidence."); see also Hopp v. Aetna Life Ins. Co., 3 F. Supp. 3d 1335, 1355 (M.D. Fl. 2014).

Finally, the Court must also consider Defendant's conflict of interest as both the group policy administrator and the payor of the policy's long-term disability benefits. Blankenship 644 F.3d at 1355 ("A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds."). At this step, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Id. (quoting Doyle, 542 F.3d at 1360).

Plaintiff's primary argument on this point comes in her Reply in support of her Motion for Summary Judgment. Dkt. No. [29] at 8. Plaintiff alleges that Defendant encouraged Plaintiff to sign a "benefits coordination service form" with an entity called Allsup and to "go through Allsup to obtain her social security benefits." Id. Plaintiff argues that this agreement

"allowed Allsup to coordinate with [Defendant] regarding [Plaintiff's] entitlement to [Social Security Disability Income] benefits." Id. (citing Dkt. No. [29-1]). Additionally, Plaintiff argues that Defendant "made [Plaintiff] agree to reimburse it with those monies should such an award result in an overpayment." Id. (citing AR 1416).

Plaintiff alleges that these arrangements essentially allowed Defendant to take inconsistent positions—to argue to the Court that Plaintiff is not disabled "while arguing simultaneously through its agent" to the Social Security Administration "that [Plaintiff] is disabled"—all to its own benefit. Id. at 9. Plaintiff cites Metro Life Ins. Co. v. Glenn, 554 U.S. 105, 118 (2008),[9] arguing that "such a course of events" may be "an indication that the conflict of interest affected decision making." Id. at 8.

One of the problems for Plaintiff's argument, however, is that the documents Plaintiff refers to when suggesting that Defendant "encouraged" Plaintiff to "go through Allsup to obtain her social security benefits" do not support this allegation. Though the benefits coordination form Plaintiff signed with Allsup authorized Allsup "to disclose to and/or discuss with

---

[9] In Glenn, the Supreme Court noted that the administrator "had encouraged [the claimant] to argue to the Social Security Administration that she could do no work . . . and then ignored the agency's finding in concluding that she could do sedentary work.[.]" Glenn, 554 U.S. at 118. In the underlying decision that the Supreme Court affirmed in Glenn, the Sixth Circuit explained that the administrator had "steered [the claimant] to Kennedy & Associates, a law firm specializing in obtaining [Social Security disability] benefits." Glenn v. MetLife, 461 F.3d 660, 663 (6th Cir. 2006).

Aetna Inc. any and all information . . . which Allsup has or may develop or acquire," including with regard to "Social Security Disability Insurance Benefits," there is no indication from that document—or any others cited by Plaintiff—that Defendant (1) encouraged Plaintiff to sign this agreement or (2) that Defendant in fact took a more active role in helping Plaintiff secure Social Security Disability Income before then denying her long-term disability benefits claim. See Dkt. No. [29-1]. The Aetna Reimbursement Agreement likewise only indicates that Plaintiff agreed to reimburse Defendant "for any and all overpayments" received as a result of being awarded both Social Security benefits and long-term disability benefits under Defendant's policy. See AR 1416. Because Plaintiff has not directed the Court to documents that more clearly support its contention that Defendant encouraged this course of action and then actually benefitted from its ability to take potentially inconsistent positions, it would be improper for the Court to simply infer that this is, in fact, true. And because Plaintiff has not presented additional arguments as to why Defendant's conflict of interest may have rendered its decision arbitrary, the Court does not find that Plaintiff has carried its burden of demonstrating that Defendant's decision was arbitrary in light of its conflict of interest. Blankenship, 644 F.3d at 1355.

For the reasons discussed above, the Court does not conclude that Defendant's decision to deny long-term disability benefits completely

lacked a reasonable basis. The Court therefore does not find that

Defendant's denial was arbitrary or capricious.[10]

## V.    CONCLUSION

In accordance with the foregoing, Defendant Aetna Life Insurance

Company's Motion for Judgment on the Administrative Record [22] is

**GRANTED**, and Plaintiff Melanie Ogletree's Motion for Summary

Judgment [21] is **DENIED**. The Clerk is **DIRECTED** to close this case.


**IT IS SO ORDERED** this <u>18th</u> day of December, 2020.

**Leigh Martin May**
**United States District Judge**

---

[10] Because the Court finds that Defendant's decision to deny benefits was reasonable, it need not reach the parties' arguments regarding the potential applicability of the policy's twenty-four-month limitation on long-term disability benefits.